**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **1199SEIU UNITED HEALTHCARE WORKERS EAST,** | |
| **Petitioner,** | |
| **v.** | Civ. No. 21-17291 (KM) (CLW) |
| **AMBOY NURSING AND REHABILITATION CENTER, TEANECK NURSING CENTER, AND MANHATTANVIEW HEALTHCARE CENTER,** | **OPINION & ORDER** |
| **Respondents.** | |

<u>**KEVIN MCNULTY, U.S.D.J.**</u>:

This matter comes before the Court on the motion (DE 2) of 1199SEIU United Healthcare Workers East (the "Union") to confirm an arbitration award against Amboy Nursing and Rehabilitation Center, Teaneck Nursing Center, and Manhattanview Healthcare Center (collectively, "Employers").[1] Employers have filed an opposition to the Union's motion and a cross-motion to vacate the arbitration award. (DE 15.)

---

[1]    Certain citations to the record are abbreviated as follows:

DE = docket entry number

Pet. = Petition to Confirm Arbitration Award (DE 1)

Hansen Cert. = Certification of Katherine H. Hansen (DE 1-3)

Arb. IA = Arbitrator's Interim Award (DE 1-3 at 16, Hansen Cert. Ex. B)

Arb. IA Op. = Arbitrator's Interim Award Opinion (DE 1-3 at 23, Hansen Cert. Ex. B)

Arb FA = Arbitrator's Final Award (DE 1-3, Ex. A)

CBA = Unless otherwise specified, Hansen Cert. Ex. C. The term "CBAs" encompasses the CBA as extended by subsequent Memorandums of Agreement.

I find that the arbitrator's award drew its essence from the collective bargaining agreements ("CBAs") and therefore will confirm the award. The Union's motion to confirm the arbitration award (DE 2) is GRANTED, and the Employers' cross motion to vacate the award (DE 15) is DENIED.

## BACKGROUND

The Union represents healthcare workers at the Employers' facilities. The relationship between the Union and Employers is governed by a series of CBAs and Memorandums of Agreement ("MOAs") extending the terms of those CBAs. (Pet. ¶¶ 8–13; Hanson Cert. Exs. C–F.) Since at least 2009, Employers have been required to make contributions to various Union funds, including the Greater New York Benefits Fund ("GNYBF"). The CBAs include an "opt-out" provision, which allows employees who have health insurance from another source to opt out of health insurance coverage from the Employers. (I will call the employees who exercised this option "opt-out employees." The election to forgo coverage is sometimes referred to in the record as the "no-frills" option.) The CBAs relieve Employers from making contributions to the GNYBF on behalf of opt-out employees and require that opt-out employees be paid an additional $1 per hour. (*Id.*; CBA (Hanson Cert. Ex. C) ¶ 36.7.) (The additional $1 is sometimes referred to in the record as a "stipend.") In addition, the CBAs set forth a grievance and arbitration procedure.

After the parties were unable to resolve the dispute through the grievance process, in February 2019, the Union initiated arbitration on a grievance related to Employers' underpayment of contributions to the GNYBF and failure to pay opt-out employees the additional $1 per hour. (Pet. ¶ 20; Hanson Cert. Ex. G.) The parties chose Daniel F. Brent as the arbitrator. This contested arbitration encompassed two video hearings at which all parties were represented by counsel and able to submit evidence, offer testimony under oath, and cross-examine witnesses, and involved several rounds of briefing. The record was closed on May 27, 2021. (Pet. ¶ 22; Arb. IA Op. at 1; Hanson Cert. Exs. G–N.) Arbitrator Brent issued an interim award on June 28, 2021, awarding payment of additional hourly wages to Union members (to be

calculated based on further submissions for purposes of a final award), and requiring Employers to pay $72,104.50 in attorney's fees and $14,400 in arbitrator's fees. (Pet. ¶ 24; Arb. IA & Arb. IA Op.)

The interim award was accompanied by a twenty-page opinion in which the arbitrator found that the Union, "using the Employers' documents," had "met [its] burden" to prove the employer had underpaid employees and not made required contributions. (Arb. IA Op. at 10.) The arbitrator concluded that "the evidentiary record established persuasively" that the Employers had not accurately calculated the additional payments for opt-out employees and that the Employers did not submit adequate documentation establishing which employees opted out of health insurance. (*Id.* at 17.)[2]

---

[2]     Here, from the Final Award, is the arbitrator's own description of what he had decided:

> In an Interim Award dated June 28, 2021, the undersigned Arbitrator held that, based on the evidence submitted, Amboy Care Center, Teaneck Nursing Center, and Manhattan View Healthcare Center (the Employers) failed to make all required contributions to the Greater New York Benefit Fund and the 1199 SEIU Education Fund (the Funds) commencing in December 2014, as the evidentiary record established persuasively that the Employers did not properly calculate the additional "no frills" hourly stipend or apply the stipend accurately and uniformly to employees' then current rate for employees who had submitted a valid "no frills" waiver. The Employers also did not submit adequate documentation to the Union or at arbitration, or thereafter to date, establishing which bargaining unit employees had formally elected to opt out of health benefit coverage provided through the Benefit Fund, and the date that the employee opted out. Such a documented formal election would have relieved the Employers of making Benefit Fund contributions, provided that the Employers paid each employee who properly elected to opt out of Benefit Fund health benefits a "no frills" stipend of an additional dollar per hour above the employee's then current hourly wage rate for every hour worked. Such payments were the consideration for excusing the Employers from remitting full Benefit Fund and Education Fund contributions pursuant to their collective bargaining agreements with 1199SEIU.
>
> Therefore, the Employers were ordered to pay aggrieved employees for whom monthly contributions to the Funds were not timely remitted and for whom the Employers have not produced evidence that the

The Union was directed to submit a list of employees and documentation of the amounts they were owed; Employers did not object to the calculation or request an extension of time to object. (Pet. ¶¶ 25–30; Arb. FA at 4.) On August 16, 2021, the arbitrator issued his Final Award, ordering Employers to pay approximately $600,000 in back wages to affected employees within 5 days, in addition to the attorneys' and arbitration fees. (Pet. ¶ 31; Arb. FA at 6; DE 2-1 at 5.)

Employers did not comply with the arbitrator's order. On September 21, 2021, the Union petitioned this court to confirm the arbitration award. (Pet., DE 1.)

A week later, having learned that Employers were planning to sell the facilities, the Union filed an emergency motion for an order to show cause. (DE 4.) I granted the motion and temporarily enjoined Employers from disposing of the proceeds of any sale that took place, up to the amount of the award. (DE 6) I set a show cause hearing to take place on October 13, 2021. That hearing was postponed to October 29, 2021, at the request of Employers' counsel, who were relocating their offices and had experienced an interruption in computer access. Counsel for the Union took no position on the adjournment request. (DE 6, 11, 12.)

---

employee elected "no frills" coverage, thereby waiving health insurance obtained through the 1199 Benefit Fund, the difference between each employee's regular wage rate and one additional dollar per hour per employee to every such aggrieved bargaining unit employee for all hours worked from December 1, 2014 to date and continuing in the future, less any such payments that were properly computed and paid to such employees.

(Arb. FA at 1–2.)

The arbitrator also ordered that the Employers pay the documented out-of-pocket medical expenses of Yeymi Colon, an employee who was denied healthcare coverage without adequate proof that she had opted out. (Arb. IA Op. at 19; Arb. FA at 4–5.)

## STANDARD OF REVIEW

This court has jurisdiction over this dispute under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The scope of my review of the arbitration award is very narrow. Due to "the strong Congressional policy of encouraging the peaceful resolution of labor disputes by means of binding arbitration," *Kane Gas Light & Heating Co. v. Int'l Bhd. of Firemen & Oilers, Loc. 112*, 687 F.2d 673, 678 (3d Cir. 1982), "courts play an extremely limited role in resolving labor disputes," *News America Publications, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21 (3d Cir.1990). Consequently, I must uphold the arbitrator's award if it "draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." *Akers Nat. Roll Co. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 712 F.3d 155, 160 (3d Cir. 2013) (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)) (internal quotation marks omitted). An arbitrator's award "draws its essence" from the CBA "if the interpretation can in any rational way be derived from the agreement." *Id.* (quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). In 1990, the Third Circuit defined the "singularly undemanding" test used to determine whether an arbitration award is valid:

> As long as the arbitrator has *arguably* construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that arbitrator has committed a serious error. This Court has held that there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award. Thus, only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award. ... An arbitral award may not be overturned for factual error, or because the court disagrees with the arbitrator's assessment of the credibility of witnesses, or the weight the arbitrator has given to testimony.

*Newark Typographical Union*, 918 F.2d at 24 (cleaned up; emphasis in original).

## DISCUSSION

Employers argue that the arbitrator's award does not draw its essence from the CBA and should be vacated because it "improperly added language to the agreement" in two different ways. (DE 15-1 at 6.) First, Employers argue that the arbitrator "improperly invented new provisions added to the agreements, which new language required that employees opting out of health care benefits to do so in writing and that the Employers were required to retain those documents." (*Id.* at 11.)[3] Second, Employers argue that the arbitrator "improperly added language to [the CBAs] defining the rate to which the $1.00 opt out bonus would apply as an employee's hourly wage at the time of the opt out, as opposed to the contractual minimum rate set forth in the CBAs." (*Id.* at 13.) I disagree and find that in both cases, the arbitrator's decision drew its essence from the CBA, requiring that I confirm the award.

### a. Opt-Out Procedures

The arbitrator's requirement that the Employer maintain adequate written records of opt-outs is rationally derived from the CBAs, and the arbitrator's decision on this issue draws its essence from the CBAs.

Employers across this country contribute billions of dollars each year to provide health insurance benefits for their employees. Generally, employees have a portion of the cost deducted from their gross pay. Some employees, however, receive health insurance benefits from another source, such as the health plan of an employed spouse. Such employees often opt out of their own employer's health plan, saving both the employee and employer money. In many cases, the employer's savings are not passed on to the opt-out employee. In this case, however, the Union has negotiated a provision requiring that any

---

[3]     The Employer's characterization of the arbitrator's decision as imposing a specific requirement that employees submit their opt-out waivers in writing may overstate the actual language of the decision. *See* n.2, *supra*. To be sure, it would be preferable and advisable for the employer to obtain a written waiver from the employee, but the arbitrator's decision appears to leave open the possibility of an opt-out being adequately documented in another manner.

employee who opts out of health coverage be paid an additional $1 per hour. This still represents a benefit to the Employers, who are released from paying 34.5% of that employee's wage into the GNYBF (Arb. IA Op. at 9), but it requires the Employers to share some of those savings with the employees in the form of a $1 hourly wage increase.

The essentials of the opt-out scheme are not in doubt. At issue is whether the Employers maintained and submitted documentation adequate to identify opt-outs.

The CBAs in this case require that the Employers maintain and make available certain information concerning payroll and GNYBF contributions:

> The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the [GNYBF] all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the employees.

(Arb. IA Op. at 11; CBA ¶ 36.4.) The CBAs also require that employees who wish to opt out show proof that they have other insurance. (CBA ¶ 36.7.) In addition, state and federal laws require Employers to keep records of employees' pay and deductions. *See, e.g.*, 29 U.S.C. § 211; 29 CFR § 516.2; N.J. Stat. Ann. § 34:11-56a20.

Both the law and the CBAs, then, explicitly identify some records that must be kept and made available for inspection. Most pertinent here, the CBAs require maintenance and inspection of records that may be required by the health insurers or required for efficient operation of the GNYBF. At a minimum, the arbitrator could reasonably have concluded, this implies some level of reliable recordkeeping as to whether a particular employee had or had not opted out of the Plan.

The arbitrator ruled that the "Employers should have created and retained written memorialization of an employee's decision to opt out of a benefit as important as healthcare coverage" because this "requirement is

consistent with the parties' contract language." (Arb. IA Op. at 10, 13; *see also id.* at 9 (Employers were "obligated to create and maintain [] written records" to document which employees have voluntarily opted out of health insurance coverage).) From the evidence, the arbitrator concluded "that the Employers failed to maintain adequate records of which employees elected to waive Benefit Fund healthcare coverage, failed to provide the Union with the contractually mandated reports on a timely basis, and have not consistently paid" the extra $1 per hour to employees for whom the Employers did not make contributions to the GNYBF. (*Id.* at 13–14.)

Construing the CBAs to include a requirement that Employers maintain written documentation of employee opt-outs is a logical derivation from the text of the CBAs. The stakes of health insurance coverage are very high. It is illogical, for example, that the CBAs would contemplate that employees may simply walk into a manager's office and orally opt out of insurance coverage, with no written confirmation of any kind, leaving future disputes over the existence of health insurance coverage to the memories of the participants. Or so an arbitrator could reasonably conclude.

In short, the text of the CBAs provides an adequate basis for the arbitrator's decision to place the burden on Employers to obtain, maintain, and furnish reliable records of who opted out. Their failure to do so led to adverse factual and legal rulings in arbitration. This component of the arbitrator's decision thus drew its essence from the CBAs, and I must confirm it.

### b. One Dollar Hourly Wage Hike

The CBAs do not explicitly state either way the base level of salary to which the "additional" $1 per hour for opt-out employees is added. The Employer argued that it is added only to the minimum hourly wage under the CBAs. The arbitrator read the CBAs to require that it be added to the employee's actual hourly wage at the time the employee opted out. The arbitrator's interpretation is a logical reading that draws its essence from the CBAs.

8

The CBA reads as follows: "Employees who opt out shall be paid an additional one dollar ($1.00) per hour for all hours paid." (CBA ¶ 36.7.) Employers' argument that a dollar should be added only to the contractual minimum wage rate implies that any employee already earning the contractual minimum plus one dollar (or more) would receive no additional benefit for opting out of the health insurance plan.[4] The arbitrator found that the Employers' position was "contrary to the plain meaning of the parties' agreement" (Arb. IA Op. at 8), and ruled that the extra $1 per hour should be added to the hourly rate an employee was being paid at the time the employee opted out. Factually, he found that the Employers' evidence on this issue was "conclusory, unpersuasive and contrary to the documents provided by the Employers on which the Union relied in its case." (Arb. IA Op. at 14.) It followed that the affected employees had been underpaid.

The arbitrator's conclusion was a logical interpretation that drew its essence from the CBAs. On its face, the provision grants a wage increase to a certain class of employees—"Employees who opt out"—and not to some subclass thereof. That class having just been explicitly defined, the word "additional" is most naturally read to set a dollar amount, not to redefine or limit the class of affected employees. The provision states that the opt-out employees "shall be paid" an additional dollar per hour; the Employers' formulation, under which many would not be paid any additional amount at all, is in tension with this language. The provision also requires that opt-outs receive an "additional" $1 "for *all* hours paid," an inclusive formulation. If it applied only to some hours paid to some opt-outs, that intent surely would have been expressed. And by its nature, the phrase "for all hours paid" appears to take the employee's status quo as a baseline for the $1 increase.

The Merriam-Webster Dictionary defines "additional" as "more than is usual or expected." *Additional*, Merriam-Webster Dictionary,

---

[4]     It is not clear whether any employees were paid at a rate between the minimum and minimum-plus-$1.

https://www.merriam-webster.com/dictionary/additional. The Employers' interpretation would effectively define "additional" to mean "zero" in many cases; the calculation would yield a figure that is *less* than what was "usual or expected," based on current salary. The most natural reading of this phrase is that employees who opt out would receive a dollar more per hour than they otherwise would—that is, a dollar more than the hourly wage they were receiving when they opted out. That interpretation also makes sense in light of the obvious contractual purpose of giving employees a financial incentive to secure health insurance elsewhere, thus saving the Employers money; indeed, the arbitrator at one point referred to it as "consideration" for the opt-out.

On this issue, then, the arbitrator's interpretation is rationally derived from the text of the CBAs and drew its essence from them. On this issue, too, I must confirm the award.

## ORDER

For the reasons set forth above,

IT IS, this 27th day of October, 2021,

**ORDERED** that the Union's motion to confirm the arbitration award (DE 2) is **GRANTED** and the Employers' cross motion to vacate the arbitration award (DE 15) is **DENIED**.

At the hearing now scheduled for October 29, 2021, the Court will discuss with the parties the form of judgment. The Court retains jurisdiction, and the temporary restraints remain in place.

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**